Casey, C. J.,
dissenting:
Assistant Quartermaster General Thomas, by direction of the Secretary of War, wrote, on the 6th day of February, 1858, to Sibley’s*agent: “I have to propose that the department pay you the sum of $5 for each tent made for the use of the army, the number not less than 200 annually, as long as this agreement may he confirmed ly the War Department.” The agent replies on the same day, and says: “After the completion of the Sibley tents now being made, you are authorized to make as many of the Sibley tents as the government may require, by paying me $5 for each tent; and this arrangement holds good until January 1, 1859, and longer, unless notified to the contrary by me.” The payments were to be made monthly, or quarterly, as the tents should be manufactured.
On the 26th of November, 1861, the Quartermaster General wrote to the Secretary of War reciting the existence of the agreement, the defection of Major Sibley, and that the department, *128 acting under the decision of his predecessor, had thus far allowed Major Burns $2 50 “royalty” upon each tent. He then calls the attention of the Secretary to No. 1002 of the Bevised Army Begulations, as follows:
“1002. No officer or agent in the military service shall purchase from any other person in the. military service, or make any contract with any such person to furnish supplies pr services, or make any purchase or contract in which such person shall be admitted to any share or part, or to any benefit to arise therefrom-.”
Upon this communication Secretary Cameron endorsed as follows:
“ No further payments will be made to Major W. W. Burns on account of ‘ royalty ’ on the 1 Sibley tent.’
“ SIMON CAMEBON,

u Secretary of War.

“War Department, December 26, 1861.”
The opinion of the majority is based upon two points, in neither of which am I able to concur:
1st. That the order of Secretary Cameron was not a suspension, or abrogation, or termination of the contract.
2d. Even if it had been intended by the order to -terminate the contract, it was ineffectual, because no notice of it was given to the claimant.
It must be borne in mind that, by its express terms, the contract was only to continue during the pleasure of the Secretary of War. He had the clear and undisputed right to abrogate or end it any moment he chose to do so. For this purpose no formula of words was necessary. Any order or direction which indicated or implied such a design were as potent and as effectual as the most -formal and technical declaration could have been. This contract was to continue, and the payments to be made, only “ so long as it should be confirmed by the War Department.” I do not see how a want of confirmation, or of continued approval, could be more strongly expressed than in the pithy sentence of the Secretary, “ No further payments will be made to Major Burns on account of ‘royalty’ on the ‘ Sibley tent.’” For, in giving a construction to this order, we are not *129 only to consider its terms, but we are to construe tbem in connection with, tbe contract and the letter of the Quartermaster General, to which they specially refer. Now, in this letter the Quartermaster General submits the two facts, that since the making of the contract the person with whom it was made has gone off into rebellion against the United States$ and the regulation prohibiting contracts with or purchases from a person connected with the military service. The opinion of the Quartermaster General as clearly indicated in this letter was, that both Sibley’s defection and the army regulation quoted affected the validity and legality of payments on this contract. The Secretary’s orders affirmed this view. At all events, if it did nothing more, it suspended the operation of the contract until further orders, and none such ever were made. The right to terminate included the right to suspend.
The contract, in express terms, was made subject to the continued approval of the Secretary of War. He could end it at any moment and by a word. This was the first time the Secretary’s attention had been called to the subject since Sibley’s defection — the first time Burns’s attitude and relation to the contract was brought to his notice. Upon this he acts promptly by withdrawing the approval and “ confirmation” of the department to Sibley’s contract. How could a withdrawal of confirmation and approval be more strongly expressed than by directing all payments on its account to be stopped ? The effect of such an order could not be misunderstood. It was intended to end or suspend the contract, and all parties so understood it at the time, and they acted upon that hypothesis. The letter is a complete indorsement and approval of the views of the Quartermaster General of the illegality of the contract. The Secretary was as much bound by the regulation as anybody else while it was in force. He so construes it; and, looking upon the whole arrangement as illegal and unauthorized, he by the clearest intendment determined to put an end to it.
That Burns had no notice of this cannot be maintained. Burns, would find, on the next monthly or quarterly day of payment, that farther payments were forbidden, and by inquiry he would, and did, find out that it was in consequence of this order ending the arrangement. But no notice was required by the *130 contract set up. The Secretary bad a right to terminate tbe contract any moment, without notice to anybody, and least of all to Burns, who was no party to it. After December 26, 1861, there was, therefore, no contract in existence, for the Secretary, as he had a clear right to do, had terminated the one made before that time. How stands Major Burns without such a contract ? If he had any interest in the patent, he had a remedy for its infringment against any one who interfered with his rights. For such an injury the law has provided a remedy, and designated a tribunal to enforce it. That tribunal is not the Court of Claims, as we decided in the Pitcher case, (1 0. Cls. Kep., p. 7.) In my opinion the ruling of the majority here is a plain departure from the principles there announced.. The two cases are utterly irreconcilable. So the claimant’s counsel thought, and they directed their main argument to show that it was unsound in principle and unsupported by authority. And while the majority do not overrule it in terms, the effect of this ruling is to so limit and circumscribe its operation as to leave nothing of it worth preserving.
The facts show that before December 26,1861, the government had manufactured and received 4,170 tents. Of these, 3,849 were paid for, leaving unpaid, 321. The evidence also shows that 13,494 tents were bought from various individuals under contracts by which these parties assumed to pay the royalty. Whether these parties had not a right or license to manufacture them has not been shown. If they had not, a complete and perfect remedy was afforded to the owner of the patent. Nor would the contract with the United States have been any answer or defence to such action, for the parties expressly agreed to be responsible for the royalty or patent-right fees.
In the contract with Landellthe United States expressly agreed in the contract to be liable to Burns for $2 50 on each tent, and that sum was deducted from the price of the tents. An action, therefore, for money had and received to his use could probably be maintained for the amount.
The contract upon which this suit is brought is made with Sibley alone. When it was made, Burns, the claimant, was no party to it and had no interest in it. It is made in February, 1858, andhis agreement of partnership with Sibley is not entered into until April 15,1858. That agreement is not an assignment *131 or transfer of anyinterest in tbe patent. Tbe parties do not even pretend this, for it is not even acknowledged or recorded as an assignment. It is only wbat it purports on its face to be, a partnership for tbe purpose of introducing into tbe army Sibley’s patent tent, and share “ tbe benefits and net profits arising from” its manufacture and use. This of itself constitutes them partners. But it is notleftto implication, for tbe parties themselves twice, in tbe agreement, designate them arrangement, as a “ partnership.” Tbis partnership was dissolved by tbe disloyalty of Sibley.-He became a public enemy. And with tbe dissolution of the partnership fell all of Burns’s interest. Could Burns under tbis agreement sue any one manufacturing these tents for in-fringment of bis rights ? Clearly not, because be has no right to tbe patent. He sues here not upon any right in tbe patent, but upon an express contract made with tbe Secretary of War; and gives in evidence one made, not with himself, but with Sibley; and alleges, not an assignment of that particular contract, or an interest in it to him, but a general partnership in respect of these tents entered into after its date with Sibley. Tbe highest effect that could, in view of tbe facts in tbe case, be given to tbis agreement of partnership, is that it operated by way of appointment or assignment of one-half tbe net proceeds. But that be could sue upon such a contract made with- Sibley, in bis own name, no lawyer ever dreamed, no judge ever decided. Against bis right to do so stands the plain and unambiguous provisions of tbe act of February 26, 1853; not only forbidding all such assignments, but making them utterly null and void. But it is said tbe Quartermaster General recognized Burns’s right by directing payment to him for some of tbe tents. But wbat right bad tbe Quartermaster General to change tbe contracts of bis superior, tbe Secretary of War? Wbat possible right could be have to validate an assignment which an act of Congress bad declared should be void 1 But neither tbe one nor tbe other was attempted. Tbe payments were made under a misapprehension, and do not operate by way of estoppel on •the United States. That doctrine has no place against a government when acting by its subordinate officers and agents. (Sines v. The United States, 1 C. Cls. R., p. 1; Pierce v. The United States, ibid., 270; Cote v. The United States, 3 ibid., 61.) Whatever equitable right Burns may have in tbe contract with Sibley be derives through Sibley and must sue for it in bis name. And *132 when he does so he is confronted by the provisions of the 12th section of the act of March 3, 1863, that not only the claimant but that the original, and every prior owner, must have always borne true allegiance to the United States, &c. The agreement between Sibley and Burns was not proved. Burns filed in the War Department what he alleged to be a copy of it, and the War Department certified it to us. It is a copy of a copy, and has no other proof than the claimant’s allegation that it is a copy of the original in his possession, which he has not produced or proved in any way whatever.
It is true that the attorneys for the United States have not made this objection to the proof. That they should overlook or neglect so vital a matter is rather surprising. But as this forms the whole foundation of the large judgment in the case, it appears to me the court of its own motion should have required other proof.
For these reasons, I think the claimant has no right to maintain this action in his own name for the royalty due under the contract with Sibley, and that in respect to that his petition should be dismissed.